# United States Court of Appeals for the Federal Circuit

---

**JACK WOLFSKIN AUSRUSTUNG FUR DRAUSSEN GMBH & COMPANY KGAA,**
*Appellant*

**v.**

**NEW MILLENNIUM SPORTS, S.L.U.,**
*Appellee*

---

2014-1789

---

Appeal from the United States Patent and Trademark Office, Trademark Trial and Appeal Board in No. 91195604.

---

Decided: August 19, 2015

---

RICHARD LEHV, Fross, Zelnick, Lehrman & Zissu, P.C., New York, NY, argued for appellant. Also represented by ROBERT A. BECKER.

PHILIP BAUTISTA, Taft, Stettinius & Hollister, LLP, Cleveland, OH, argued for appellee.

---

Before LOURIE, BRYSON, and CHEN, *Circuit Judges.*

CHEN, *Circuit Judge.*

Appellant Jack Wolfskin Ausrustung Fur Draussen GmbH & Co. KGAA (Jack Wolfskin) applied to the Patent and Trademark Office to register a design mark consisting of an angled paw print for use with its clothing, footwear, and accessory products. Appellee New Millennium Sports, S.L.U. (New Millennium) opposed the registration on the ground that Jack Wolfskin's mark would likely create confusion with its own registered mark. In response, Jack Wolfskin filed a counterclaim for cancellation alleging that New Millennium had abandoned its registered mark. The Trademark Trial and Appeal Board (Board) rejected Jack Wolfskin's cancellation counterclaim and sustained the opposition, thus refusing to register Jack Wolfskin's mark. We agree with the Board that New Millennium did not abandon its registered mark. We conclude, however, that the Board incorrectly found a likelihood of confusion between the two marks because the Board failed to properly compare New Millennium's mark *as a whole* to Jack Wolfskin's mark and also failed to recognize, in light of the significant evidence of paw prints appearing in third-party registrations and usage for clothing, the relatively narrow scope of protection afforded to marks involving paw prints. We therefore affirm-in-part, reverse-in-part, and remand for further proceedings consistent with this opinion.

## I.    BACKGROUND

New Millennium owns Trademark Registration No. 1,856,808 (KELME mark).



New Millennium registered the KELME mark for use in association with goods in International Class 25, which

encompasses a variety of clothing products.  The KELME mark was registered on October 4, 1994.

On September 10, 2009, Jack Wolfskin filed U.S. Trademark Application Serial No. 77/823,794 with the Patent and Trademark Office, in which it sought to register a mark consisting of "a nonhuman paw print."  Joint Appendix (J.A.) 28.



In its application, Jack Wolfskin sought this trademark for a variety of products classified in International Classes 9, 18, 22, and 25.

New Millennium filed an opposition asserting that Jack Wolfskin's mark would likely cause confusion with New Millennium's KELME mark.  *See* 15 U.S.C. § 1052(d).  New Millennium limited its opposition to goods in International Class 25.  In response, Jack Wolfskin denied that its mark would cause confusion and counterclaimed to cancel New Millennium's KELME mark on the basis of abandonment.

The Board rejected Jack Wolfskin's abandonment counterclaim finding that New Millennium had continuously used the registered mark or a version that was not a "material alteration" of the registered mark.  The Board then evaluated New Millennium's likelihood-of-confusion claim according to the factors announced by our predecessor court in *In re E. I. DuPont DeNemours & Co.*, 476 F.2d 1357, 1361 (CCPA 1973) (*DuPont* factors), and concluded that Jack Wolfskin's mark would likely cause confusion. The Board therefore sustained New Millennium's opposition and refused to register Jack Wolfskin's mark.

Jack Wolfskin appeals both parts of the decision. We have jurisdiction under 28 U.S.C. § 1295(a)(4)(B). Although we agree with the Board that New Millennium did not abandon its registered mark, we disagree that Jack Wolfskin's mark is confusingly similar to New Millennium's mark.

## II.    ABANDONMENT COUNTERCLAIM

Jack Wolfskin's cancellation counterclaim relies on the fact that New Millennium ceased using the registered version of its mark and instead began using a modified or modernized version of that mark. Because of this change, Jack Wolfskin contends that New Millennium abandoned its registered mark and that it should therefore be cancelled. New Millennium does not dispute that it no longer uses the exact mark that appears in its registration and admits that it has not used that version since 2004. New Millennium argues, however, that it has not abandoned its mark because the differences between the modernized mark and the registered mark are minor.

## A.    Legal Standard

A trademark owner abandons its mark if use of the mark has been "discontinued with intent not to resume." 15 U.S.C. § 1127. If a registered mark has been abandoned, a party may file a petition to cancel the registration at any time. 15 U.S.C. § 1064(3). Abandonment may also be alleged in a counterclaim to an opposition filed by the owner of the purportedly abandoned mark.

Trademark owners sometimes cease using their literal registered marks in favor of modified or modernized versions. As McCarthy explains,

> [s]uch changes in the form of marks have been legally attacked on two grounds: (1) that the change resulted in abandonment of rights in the old form; (2) that the change prevents the user from tracing

> priority of use back to a date of first use of the old
> form of the mark.

J. Thomas McCarthy, 3 McCarthy on Trademarks and Unfair Competition § 17:25 (4th ed. 2015) [hereinafter McCarthy].  This ability to rely on an earlier form of a mark, when now using a modified version of that mark, is often called "tacking."  Courts have referenced tacking in both abandonment and priority contexts.  *See Hana Fin., Inc. v. Hana Bank*, 135 S. Ct. 907, 909 (2015) (recognizing that "tacking" encompasses situations where an entity makes modifications to its marks over time, but is still able to "clothe [that] new mark with the priority position of an older mark"); *Sunstar, Inc. v. Alberto-Culver Co.*, 586 F.3d 487, 496 (7th Cir. 2009) (explaining that the rule of "tacking on" "makes the use by a trademark's owner of a variant of his original trademark a defense to a claim that replacing the original with the variant constituted the abandonment . . . of the trademark").  McCarthy also recognizes that "[i]mproper tacking [by using a modified mark that materially alters the earlier mark] can result in 'abandonment' of the old form of the mark" if the elements of abandonment—nonuse with intent not to resume use—are satisfied.  McCarthy § 17:26.

In the context of a priority dispute, we previously held that if the old form and the new form of the mark are "legal equivalents," such legal attacks will fail.  *Van Dyne-Crotty, Inc. v. Wear-Guard Corp.*, 926 F.2d 1156, 1159 (Fed. Cir. 1991), *abrogated on other grounds by Hana Fin.*, 135 S. Ct. at 910.  Two marks are legally equivalent if they "create the same, continuing commercial impression" and where the modified version of the mark does not "materially differ from or alter the character" of the original mark.[1]  *Id.* (citation and internal quotation marks

---

[1]     Jack Wolfskin contends that this "material altera-tion" standard originates from the statute governing

omitted); *see also Ilco Corp. v. Ideal Sec. Hardware Corp.*, 527 F.2d 1221, 1224 (CCPA 1976) ("The law permits a user who changes the form of its mark to retain the benefit of its use of the earlier form, without abandonment, if the new and old forms create the same, continuing commercial impression.").

---

trademark amendments.  15 U.S.C. § 1057(e) (permitting amendment to a registered mark so long as that amendment "does not alter materially the character of the mark").  The Trademark Manual of Examining Procedure (TMEP) explains that an amendment to a mark is material if "the change would require republication in order to present the mark fairly for purposes of opposition." TMEP § 1609.02(a); *see also* 37 C.F.R. § 2.72(a)(2) (amending a mark is permissible if "[t]he proposed amendment does not materially alter the mark.").  As far as we can tell, this "republication" standard has been used only in the context of determining the propriety of a proposed amendment.  *See, e.g.*, *In re Thrifty*, 274 F.3d 1349, 1352–53 (Fed. Cir. 2001) (applying the material alteration standard in affirming the Board's rejection of an amendment to a rejected trademark application). Furthermore, the TMEP also explains that "[i]n determining whether an amendment is a material alteration, the controlling question is always whether the new and old forms of the mark create essentially *the same commercial impression*."  TMEP § 1215.08 (emphasis added); *see also* TMEP § 807.14.  Thus, even if we were to embrace the TMEP provisions relating to amendment, our analysis for abandonment would not change.  *See In re Thrifty*, 274 F.3d at 1352–53 ("To avoid material alteration, the new form must create the impression of being essentially the same mark." (internal quotation marks omitted)).

We have not spoken directly on what standard to use in the abandonment context. The Board, however, employs the "same, continuing commercial impression" standard when evaluating whether changes to a mark result in abandonment of an earlier registered mark. *See, e.g.*, *Paris Glove of Can., Ltd. v. SBC/Sporto Corp.*, 84 U.S.P.Q.2d 1856, 1861 (T.T.A.B. 2007) (citing McCarthy § 17:26) ("[A] change in the form of a mark does not constitute abandonment or a break in continuous use if the change neither creates a new mark nor changes the commercial impression of the old mark."). In addition, other circuits have also adopted this standard in the abandonment context. *See, e.g.*, *George & Co. LLC v. Imagination Entm't Ltd.*, 575 F.3d 383, 402 (4th Cir. 2009) (concluding that the trademark owner had abandoned its registered mark where it could not "tack" its prior use of the mark to its current, modernized version of that mark because its new mark did not create the same continuing commercial impression); *Sands, Taylor & Wood Co. v. Quaker Oats Co.*, 978 F.2d 947, 955 (7th Cir. 1992) (examining whether the differences between the registered and the modified marks alter the "basic, overall commercial impression created on buyers" and stating that "[s]o long as the owner continues use of the 'key element' of the registered mark, courts generally will not find abandonment").

In both contexts—priority and abandonment—the fundamental inquiry is the same: has the original mark been so substantially altered such that third parties would not expect that presently used mark to be used under and protected by the registration.. Our case law recognizes that it would be wrong to allow a trademark owner to claim priority to a mark that creates a different commercial impression from the mark currently in use. This same inequity exists when a trademark owner seeks to avoid abandonment of the originally registered mark even though the current mark is a materially different

version. We hold that the same legal standard applies in both contexts. Accordingly, when a trademark owner uses a modified version of its registered trademark, it may avoid abandonment of the original mark only if the modified version "create[s] the same, continuous commercial impression."

## B.   Standard of Review

The Supreme Court recently held, in the context of a priority dispute, that the "same continuing commercial impression" inquiry is a question of fact, thus abrogating our practice of viewing this inquiry as a question of law subject to *de novo* review. *Hana Fin.*, 135 S. Ct. at 910–11 (citing *Van Dyne-Crotty*, 926 F.2d at 1159). In *Hana Financial*, the Supreme Court explained that "[a]pplication of a test that relies upon an ordinary consumer's understanding of the impression that a mark conveys falls comfortably within the ken of a jury." *Id.* at 911. Given our understanding that the same legal analysis applies in both priority and abandonment cases, there is no reason that the standard of review should differ. We therefore must review the Board's factual determination for substantial evidence. In doing so, we must ask whether a reasonable fact-finder might find that the evidentiary record supports the Board's conclusion. *See Consol. Edison Co. of N.Y. v. N.L.R.B.*, 305 U.S. 197, 229 (1938).

## C.   Discussion

New Millennium's registered mark is a composite mark consisting of the word KELME on the left and an image of a paw print on the right.



Registration No. 1,856,808. As noted above, New Millennium admits that it no longer uses the exact mark that

appears in its registration.  Since 2004, New Millennium has instead used a modified version of its mark.  The presence of the KELME and paw print elements, as well as the orientation of these elements, did not change.  New Millennium altered only the font of the KELME element and the style of the paw print element.



The Board found the changes to the mark to be minor stylistic alterations.  In evaluating the KELME element of the mark, the Board noted that "the style shown in the registration is relatively non-distinctive, and the style in which the letters are now presented is highly conventional."  *New Millennium Sports, S.L.U. v. Jack Wolfskin Ausrustung Fur Draussen GmbH & Co. KGAA*, No. 91195604, 2014 WL 2997637, at *5 (T.T.A.B. June 10, 2014).  The Board further recognized that KELME, the word element of the mark, was "far more distinctive than the lettering in which it is presented" and therefore the change in the style of the lettering did not materially affect the impression created by the word.  *Id.*  With respect to the paw print design component of the mark, the Board rejected Jack Wolfskin's arguments that the registered mark could be interpreted as something other than a paw.  *Id.* ("If the design resembles in any way a mountain, a volcano, or a setting sun, it does so only in a very vague way.").  The Board was also not persuaded that the addition of claws to the paw prints materially altered the mark because the claws are "a very small component" and because "it is common knowledge that an animal's paws are accompanied by claws." *Id.*

We agree.  Despite the stylistic modifications, the mark that New Millennium currently uses still consists of the literal KELME element and the paw print design element.  The KELME portion still appears in all capital,

block style lettering. The minor adjustment to the font is not sufficient to warrant a finding that consumers would view these as different marks. Likewise, Jack Wolfskin presents no persuasive reason why the alterations to the design element change the commercial impression that the mark creates. As the Board stated, "[i]t appeared to be a paw before, and now it still appears to be a paw." *Id.* For these reasons, we conclude that the Board's finding that New Millennium did not abandon its registered mark by migrating to a modernized version of its mark is supported by substantial evidence. A reasonable fact-finder could conclude that the new version creates the same continuing commercial impression as the registered mark. We therefore affirm the Board's dismissal of Jack Wolfskin's cancellation counterclaim.

## III.   LIKELIHOOD OF CONFUSION

Whether there is likelihood of confusion between a registered mark and a mark for which an application has been filed presents an issue of law based on underlying facts, namely findings under the *DuPont* factors. *M2 Software, Inc. v. M2 Commc'ns, Inc.*, 450 F.3d 1378, 1381 (Fed. Cir. 2006). We review the Board's legal conclusions *de novo* and its factual findings for substantial evidence. *In re Pacer Tech.*, 338 F.3d 1348, 1349 (Fed. Cir. 2003).

The Board found evidence in the record relevant to seven *DuPont* factors. Specifically, the Board found that the similarity of the goods, the similarity of the trade channels, and the similarity of the marks pointed to a likelihood of confusion, whereas the similarity of the buyers and purchasing conditions were either neutral or slightly favored finding a likelihood of confusion. In addition, the Board decided that the number and nature of similar marks in use, the fame of New Millennium's mark, and the absence of actual confusion were neutral factors. The Board then balanced these factors and concluded that Jack Wolfskin's mark, "as used in connec-

tion with the identified goods, so closely resembles opposer's registered mark as to be likely to cause confusion, mistake or deception as to the source of applicant's goods." *New Millennium*, 2014 WL 2997637, at *14.

Neither party asserts that the Board erred by failing to consider any of the remaining factors. *See M2 Software*, 450 F.3d at 1382 ("Neither we nor the board, however, are required to consider every *DuPont* factor. Rather we need to consider only the factors that are relevant and of record." (citation omitted)). On appeal, Jack Wolfskin asserts that the Board's likelihood of confusion conclusion is erroneous because of a lack of substantial evidence supporting two critical factors: (1) the similarity of the marks; and (2) the number and nature of similar marks in use. We agree.

## A. Similarity of the Marks

Our predecessor court instructed that the similarity or dissimilarity of marks should be compared "in their entireties as to appearance, sound, connotation and commercial impression." *DuPont*, 476 F.2d at 1361. "[M]arks must be viewed 'in their entireties,' and it is improper to dissect a mark when engaging in this analysis, including when a mark contains both words and a design." *In re Viterra Inc.*, 671 F.3d 1358, 1362 (Fed. Cir. 2012). We have also explained that when a mark consists of both words and a design, "the verbal portion of the mark is the one most likely to indicate the origin of the goods to which it is affixed." *CBS Inc. v. Morrow*, 708 F.2d 1579, 1581–82 (Fed. Cir. 1983). These principles do not, however, trump our duty to consider marks on a case-by-case basis. *Viterra*, 671 F.3d at 1362–63. Finally, the Board may "state that, for rational reasons, more or less weight has been given to a particular feature of the mark." *Packard Press, Inc. v. Hewlett-Packard Co.*, 227 F.3d 1352, 1357 (Fed. Cir. 2000). Even so, the touchstone of this factor is consideration of the marks in total. *Id.*;

*see also Juice Generation, Inc. v. GS Enters. LLC*, No. 14-1853, 2015 WL 4400033, at *5 (Fed. Cir. July 20, 2015) (explaining that this factor "merely requires heeding the common-sense fact that the message of a whole phrase may well not be adequately captured by a dissection and recombination").

New Millennium's registered mark consists of two elements: the KELME component and the paw print design. On appeal, Jack Wolfskin argues that the Board improperly dissected New Millennium's mark by overemphasizing the paw print element and minimizing the importance of the KELME component. In response, New Millennium urges us to accept the Board's discussion of the KELME component as sufficient.

The Board's opinion did acknowledge the obligation to consider the marks in their entireties and even recognized that "the KELME component of [New Millennium]'s mark creates a visual and phonetic impression that is absent from applicant's mark." *New Millennium*, 2014 WL 2997637, at *9. But in evaluating the "appearance, sound, connotation" of the two marks, the Board discussed only the appearance, sound, and connotation of the paw print element in each mark, and did not discuss the impact of the KELME portion of New Millennium's mark. This is clear from the Board's statement that "[w]ith respect to sound, it is obvious that neither design has any phonetic element." *Id.* at *10. The Board then explained that, given the substantial similarities between the paw print elements of the two marks, the KELME component of the New Millennium mark did not distinguish the commercial impression of that mark from the commercial impression of Jack Wolfskin's mark. To support this statement, the Board broadly declared that "[c]ompanies that use marks consisting of a word plus a logo often display their logos alone, unaccompanied by the literal portions of their trademarks." *Id.* For this reason, the Board concluded that consumers could interpret Jack

Wolfskin's mark "as a display of [New Millennium]'s design apart from [New Millennium]'s word element" and accordingly this factor pointed towards a likelihood of confusion. *Id.*

We agree with Jack Wolfskin that the Board failed to adequately account for the presence of the literal, KELME component of the New Millennium mark. Contrary to the guideposts in our case law, the Board essentially disregarded the verbal portion of New Millennium's mark and found that the two paw print designs were substantially similar. This analysis did not consider the marks as a whole.

The Board justified its decision to focus on the paw print elements by stating that companies often use the design portion of a composite mark as shorthand for their brand. We do not opine as to whether such a commercial practice of truncating the registered mark could, under the right circumstances, support finding a likelihood of confusion based on that truncated version. Even so, this concept certainly cannot be invoked without supporting evidence. The Board's broad statement alone, which does not amount to substantial evidence, cannot warrant disregarding the verbal portion of a composite mark. *See Viterra*, 671 F.3d at 1366 (recognizing that emphasis on the literal portion of a mark "makes sense given that the literal component of brand names likely will appear alone when used in text and will be spoken when requested by consumers.").

New Millennium argues that it provided numerous examples in which it displayed the paw print element of its mark without the KELME brand name. None of the examples in the record, however, conclusively establishes that the paw print alone was used for source identification. For example, New Millennium points to its shoe boxes where the paw print appears on the top of the shoe box without the KELME brand name, but ignores the fact

that the KELME brand name appears on each side of the same shoe box. Similarly, New Millennium notes that the paw print appears on the sides of several of its soccer shoes, but again ignores the KELME brand name on the tongue and/or bottom of the same shoes. At bottom, neither the Board nor New Millennium has pointed to anything in the record that indicates that consumers recognize solely the paw print portion of New Millennium's registered mark as being associated with New Millennium's products. The Board's finding lacked substantial evidence for minimizing the relevance of the word element of New Millennium's registered trademark. Indeed, the Board's conclusion is even more untenable in light of the numerous examples of paw prints as source identifiers, discussed below.

This is not to say that the Board cannot, in appropriate circumstances, give greater weight to a design component of a composite mark. But, when the Board places such heavy emphasis on an oft-used design element, as it did in this case, it must provide a rational reason for doing so. *See In re Comput. Commc'ns, Inc.*, 484 F.2d 1392, 1393–94 (CCPA 1973) (holding that the Board did not err in focusing on the design portion because the Board found the large design portion to be the mark's "most visually prominent feature"). In this respect the Board failed and, as a result, its conclusion that this factor supports finding a likelihood of confusion is not supported by substantial evidence.

## B.   Other Marks in Use

"[E]vidence of third-party use bears on the strength or weakness of an opposer's mark." *Juice Generation*, 2015 WL 4400033, at *3. "The weaker an opposer's mark, the closer an applicant's mark can come without causing a likelihood of confusion and thereby invading what amounts to its comparatively narrower range of protection." *Id.*; *see also Palm Bay Imps., Inc. v. Veuve Clicquot*

*Ponsardin Maison Fondee En 1772*, 396 F.3d 1369, 1373 (Fed. Cir. 2005) ("Evidence of third-party use of similar marks on similar goods is relevant to show that a mark is relatively weak and entitled to only a narrow scope of protection.").

Before the Board, Jack Wolfskin presented voluminous evidence of paw print design elements that have been registered and used in connection with clothing, but the Board largely discounted these examples. The Board gave "little weight" to the third-party registrations "because they are not evidence that the marks are in use." *New Millennium*, 2014 WL 2997637, at *11. To the extent the Board found any of the third-party registrations supported by evidence of use, the Board largely minimized this evidence because it consisted of secondary source indicators. In many of the examples that Jack Wolfskin provided, the paw-print design was being used to identify colleges or high schools and their sports teams, rather than identifying an apparel or a sporting goods company. As such, the Board concluded that these marks "perform the function of secondary source indicators rather than conventional marks of apparel companies," and therefore "their impact on the distinctiveness of opposer's apparel trademark is somewhat reduced." *Id.* at *12. In addition, the Board rejected the relevance of another subset of the third-party usage evidence because the marks related to "secondary source indicators for businesses offering pet-related goods and services." *Id.* As to the remaining paw-print trademarks, the Board focused on the differences between those designs and the designs at issue. *See New Millennium*, 2014 WL 2997637, at *11 (finding that these marks are "quite different, in that four of them have five digits and all of them have very prominent claws"). In light of these conclusions, the Board found that this factor was neutral.

We agree with Jack Wolfskin that the Board erred in its consideration of this evidence. Jack Wolfskin present-

ed extensive evidence of third-party registrations depicting paw prints and evidence of these marks being used in internet commerce for clothing.[2]  The Board too quickly dismissed the significance of this evidence.  As we recently explained in *Juice Generation*, such extensive evidence of third-party use and registrations is "powerful on its face," even where the specific extent and impact of the usage has not been established.  2015 WL 4400033, at *4 (detailing the extensive use of marks used in connection with the food service industry that incorporate the words "Peace" and "Love" ).  For example, evidence of third-party registrations is relevant to "show the sense in which a mark is used in ordinary parlance," *id.* at *4; that is, some segment that is common to both parties' marks may have "a normally understood and well-recognized descriptive or suggestive meaning, leading to the conclusion that that segment is relatively weak," *id.*  In addition, evidence of third-party use of similar marks on similar goods "can show that customers have been educated to distinguish between different marks on the basis of minute distinctions."  *Id.* at *3 (internal quotation marks omitted).  In this case, Jack Wolfskin's evidence demonstrates the ubiquitous use of paw prints on clothing as source identifiers.  Given the volume of evidence in the record, con-

---

[2]    Some of the notable examples of third-party registration and use in commerce include the Clemson University paw print; the Ohio University paw print; the University of New Mexico paw print; the Penn State paw print; the University of Montana paw print; the Loyola University of Chicago paw print; the University of New Hampshire paw print; the Wayne State College paw print; the Bearpaw brand paw print; the Wolverine brand paw print; the Alaskan Hardgear brand paw print; Boyds Collection brand paw print; the Chester Cheetah mark for Cheetos snack foods, which incorporates a paw print; the Garanimals brand mark, which incorporates a paw print.

sumers are conditioned to look for differences between paw designs and additional indicia of origin to determine the source of a given product. Jack Wolfskin's extensive evidence of third-party uses and registrations of paw prints indicates that consumers are not as likely confused by different, albeit similar looking, paw prints. The Board's conclusion that this factor was neutral is not supported by substantial evidence.

*****

New Millennium cannot escape the fact that the KELME element of its registered mark is the dominant portion of the mark. By narrowly focusing on the paw print element of the registered mark, the Board failed to appreciate that the KELME element is unlike anything that appears in Jack Wolfskin's applied-for mark. The dissimilarity of the marks is further confirmed by the considerable evidence of third-party registration and usage of marks in commerce that depict paw prints on clothing. This evidence indicates that the paw print portion of New Millennium's mark is relatively weak. Balancing the factors, the Board's determination that Jack Wolfskin's mark would likely cause consumer confusion cannot be sustained.

## CONCLUSION

Although we affirm the Board's rejection of Jack Wolfskin's cancellation counterclaim, we conclude that the dissimilarity of the marks and the many third-party marks incorporating paw prints require us to find that there is no likelihood of confusion between the two marks. We therefore reverse the Board's decision sustaining New Millennium's opposition and remand to the Board for further consideration in light of this opinion.

## COSTS

No costs.

**AFFIRMED-IN-PART, REVERSED-IN-PART, and REMANDED**